UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | |
| LEROY CARTER SMITH, ) | CASE NO. 03-10992 |
| ) | |
|     Debtor. ) | |
| ) | |
| IN RE: ) | |
| ) | |
| LOUISE M. SMITH, ) | CASE NO. 04-10633 |
| ) | |
|     Debtor. ) | (Jointly Administered) |

MEMORANDUM OPINION

This matter came before the Court on September 27, 2005, for a confirmation hearing with respect to the chapter 11 plan proposed by Leroy Carter Smith and Louise M. Smith (the "Debtors"). The United States Bankruptcy Administrator (the "BA") and FNB Southeast ("FNB") object to confirmation of the plan on the grounds that the plan is not feasible. Concomitant with its objection to confirmation, FNB also seeks relief from the automatic stay to foreclose on the Debtors' home and business properties. For the reasons stated herein, the court will deny confirmation of the Debtors' plan and grant FNB relief from the automatic stay.

I. BACKGROUND

The male Debtor is a physician working for RMSA, Inc. ("RMSA"), a non-profit corporation under section 501(c)(3) of the

Internal Revenue Code[1] that provides medical services in Rockingham County, North Carolina.  The female Debtor is the chief executive officer of RMSA, and the Debtors jointly own the office building and land where RMSA conducts its business.  The female Debtor does not have a background in business administration or accounting; rather, she has a bachelor's degree in child development, and is educated in Bible theology and church ministry.

FNB holds a deed of trust on RMSA's office building and land, which the Debtors value at $1,500,000.  In addition, FNB is secured by the Debtor's personal residence, valued at $270,000, and a 31.7 acre tract of land, valued at $120,000.  At the time FNB filed its motion for relief from the automatic stay in Ms. Smith's bankruptcy case on March 8, 2004, it claimed that the payoff on the outstanding indebtedness to it was $1,453,916.  Ms. Smith's Chapter 11 filing was one day before a scheduled foreclosure sale of the RMSA building and land, the foreclosure of which had already been significantly delayed by Dr. Smith's prior bankruptcy filing.[2]

---

[1] A Section 501(c)(3) corporation is exempt from taxation if it is "organized and operated exclusively for . . . religious, charitable, scientific, testing for public safety, literary, or educational purposes . . . [and if] no part of the net earnings of which inures to the benefit of any private shareholder or individual . . . ."  26 U.S.C. § 501(c)(3).

[2] FNB had previously obtained relief from the automatic stay in Dr. Smith's bankruptcy case – before that case converted from Chapter 7 to Chapter 11 – and Dr. Smith filed a motion to reconsider that Order in light of his subsequent conversion to Chapter 11.  That motion to reconsider is still pending before the

After Ms. Smith's filing, FNB and the Debtors worked out an agreement for adequate protection payments pending a hearing on confirmation of the Debtors' joint plan of reorganization. Pursuant to the proposed plan, the Debtors anticipate paying FNB about $14,333 per month for 36 months. Payments are amortized over 15 years with an interest rate of prime plus 2%. At the end of the 36-month period, the Debtors propose a balloon payment of any amount that remains outstanding.

The success of the Debtors' plan is heavily dependent on the success of RMSA for three reasons. First, RMSA pays the Debtors' salaries. Second, RMSA pays the Debtors rent for the land and building, which the Debtors use to pay the note to FNB. Third, the IRS claims that RMSA owes about $876,000 in unpaid payroll taxes, interest, and penalties, for which the Debtors may be personally liable under 26 U.S.C. § 6672 should RMSA fail to fully pay that debt. RMSA has submitted a proposal to pay the IRS $13,500 per month over six years; the potential liability of the Debtors for the tax obligation – if any – is not yet determined. Granting FNB relief from the automatic stay to foreclose on RMSA's office building and land could effectively terminate RMSA's business unless it is able to find a new location and maintain its client base.

RMSA is located in Rockingham County, North Carolina.

---

Court.

According to the testimony of Dr. Smith, Rockingham County is one of North Carolina's poorest counties, and about 70% to 80% of RMSA's clients are on medicare or medicaid, another 15% to 20% are uninsured, with the remainder having private insurance.  Serving the medical needs of the uninsured and those eligible for medicare or medicaid has not historically been a lucrative practice for RMSA, and in the past, including some months during these Chapter 11 cases, it has had difficulty timely paying the salaries of Dr. Smith and another physician, Dr. Hill.  In total, RMSA employs three physicians, one physician assistant, Ms. Smith, and other office administrators.  Dr. Smith stated that RMSA – with its current staff – has all the business it can handle because a five to seven week waiting period exists to schedule an appointment with a RMSA physician.

During 2001 and 2002, RMSA's predecessor entity, Rockingham Medical and Surgical Associates, Inc., began the conversion from a for-profit corporation to a non-profit corporation under section 501(c)(3) of the Internal Revenue Code.  As a result of administrative delays for, <u>inter alia</u>, obtaining new taxpayer identification numbers and new health care provider numbers, RMSA experienced significant cash flow problems that prevented RMSA from paying its rent to the Debtors, which, in turn, meant that the Debtors defaulted on the mortgage note to FNB.  The mortgage default precipitated Dr. Smith's bankruptcy filing and eventually

the bankruptcy filing of Ms. Smith.

Both of the Debtors testified that RMSA is now fully functioning as a non-profit corporation and that it will have sufficient income in the future to pay the Debtors' salaries, pay its rent to the Debtors to allow the Debtors to pay FNB, and to pay the IRS for any payroll tax liability that might otherwise be assessed against the Debtors.

Both Debtors testified that part of the reason for becoming a non-profit corporation was to become eligible for federal, state, and private grants, and to be eligible to participate in medicare and/or medicaid reimbursement programs.  Ms. Smith testified that RMSA is an "FQHC Look-alike," which means that it is eligible to receive funding under section 330 of the Public Health Service Act.[3]  In fact, RMSA has applied for and received several grants:

> (1) In September 2005, RMSA received a $197,000 HRSA Grant to purchase new equipment that is designed to both increase doctor-patient visits through increased efficiency in computer operating systems, and to provide RMSA with additional medical equipment by which it may generate new billings.  The new

---

[3] 42 U.S.C. § 254b et seq.  Such health centers provide medical services to populations that are "medically underserved." § 254b(a)(1).  Among other things, a qualified health center is eligible to receive: planning grants that pay for "the cost of the acquisition and lease of buildings and equipment," § 254b(c)(1)(A); loan guarantees, § 254b(d); operating grants, § 254b(e), and grants to serve migratory and seasonal agricultural workers.  § 254b(g).

equipment has already been purchased, a portion of it has already been received, and according to Ms. Smith, RMSA anticipates being fully operational with all the new equipment and operating systems by January 2006, although no installation of equipment or training of employees had occurred when the confirmation hearing was held.

(2) RMSA receives yearly instalments of $90,000 from a five-year NCCHA Grant, which is used to pay the salary of Ms. Presnell, a physician assistant, for whom RMSA bills out just as if she were any other employee of RMSA.

(3) RMSA received $56,000 in September 2005 for cost-based medicare/medicaid reimbursements for the calendar year ending in 2004.

In addition to monies received, RMSA has made several other applications, or anticipates making additional applications for grants, appropriations, and reimbursements. All of these additional sources of funding are made possible by RMSA's conversion to a non-profit corporation. Ms. Smith outlined RMSA's expectations:

(1) RMSA projected receiving an additional $154,000 in October 2005 in medicare/medicaid cost-based reimbursements pursuant to a supplemental application. RMSA further anticipates that such cost-based reimbursements will be available on a yearly basis.

(2) RMSA anticipates receiving a $1,625,000 appropriation grant to build new facilities.  Ms. Smith testified that the appropriation is approved, but RMSA does not know when to expect the money.

(3) RMSA applied for and was approved for a $350,000 HRSA grant to service the medical needs of migratory workers.  That money will be available to the RMSA in May 2006.

(4) RMSA has applied for and is eligible to receive two "Ready Responders," who are physicians paid for by the federal government and deployed to help the nation's poor.  RMSA is entitled to bill out the services of the "Ready Responders" just as if they were employees of RMSA.  Dr. Smith testified that RMSA anticipated receiving two "Ready Responders" before the end of 2005.

Apart from any grant, appropriation, or reimbursement money, RMSA's day to day revenue is largely dependent on the number of patient visits that each RMSA physician or physician assistant has each day.  A doctor-patient visit at RMSA is billed at $150. However, about 20% of RMSA clients do not pay their bills and the medicare/medicaid reimbursement for a doctor visit is capped at $91.50, which Ms. Smith testified is a significant increase from the $60 per patient visit that RMSA was receiving a few years ago.

## II. ANALYSIS

The BA and FNB argue that the Debtors have failed to present

a feasible plan of reorganization.  Because the plan is not feasible, FNB argues, the Court should also lift the automatic stay to allow it to foreclose on the RMSA facility.

### A. Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires as a precondition to confirmation that a court determine that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan . . . ." 11 U.S.C. § 1129(a)(11).  The purpose of this feasibility requirement "'is to prevent confirmation of visionary schemes which promises creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation.'"  In re Pizza of Haw., Inc., 761 F.2d 1374, 1382 (9th Cir. 1985) (citation omitted).  Thus, a bankruptcy court has an obligation to carefully review a plan to determine if it is workable.  In re Monnier Bros., 755 F.2d 1336, 1341 (8th Cir. 1985).  Success need not be guaranteed – the possibility that a plan may fail is not fatal – but a plan must be supported by adequate evidence that some reasonable assurance of success exists.  Kane v. Johns-Manville Corp., 843 F.2d 636, 649 (2d Cir. 1988); In re Prussia Assocs., 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005).  The debtor has the burden of demonstrating that a plan is feasible.  E.g., Lisanti v. Lubetkin (In re Lisanti Foods, Inc.), 329 B.R.

491, 496 (D.N.J. 2005) ("[T]he burden is on the plan proponents to prove that all the applicable provisions of 11 U.S.C. § 1129 have been satisfied."); In re Deep River Warehouse, Inc., No. 04-52749, 2005 Bankr. LEXIS 1793 at *5 (Bankr. M.D.N.C. Sept. 22, 2005) (same).

After reviewing the evidence presented at the confirmation hearing, the Court is convinced that the Debtors have not presented a feasible plan of reorganization. The Court reaches this conclusion for nine reasons.

First, the Court believes that RMSA's projected patient revenue for September through December 2005 is unduly optimistic. For example, in the first eight months of 2005, which figures are based on actual revenue received from patients, RMSA collected an average of $97,750 per month.[4] In July 2005, which has 31 days,

---

[4] RMSA's Statement of Activities lists the patient revenue by month. January to August 2005 are actual amounts received. September to December 2005 are projections.

|           | Patient Revenue | Grants/Reimbursements |
|-----------|-----------------|------------------------|
| January   | $103,000        |                        |
| February  | $ 79,000        |                        |
| March     | $100,000        |                        |
| April     | $ 84,000        |                        |
| May       | $101,000        |                        |
| June      | $102,000        |                        |
| July      | $110,000        |                        |
| August    | $103,000        |                        |
| September | $121,000        | $253,000               |
| October   | $201,000        | $154,000               |
| November  | $148,000        | $90,000                |
| December  | $142,000        | $1,625,000             |

RMSA was most productive in that it collected $110,000.  When RMSA began <u>projecting</u> patient revenue for September through December 2005, however, patient revenue inexplicably increased to $121,000; 201,000; 148,000; and 142,000, respectively.  The Debtors failed to adequately explain why RMSA's patient revenue would increase so dramatically in a short period of time from that which was historically proven.

Second, over the first eight months of 2005, RMSA had a net decrease in assets of $82,000.[5]  In the projections for September

---

In September 2005, RMSA projected receiving $56,000 in Medicaid cost-based reimbursement and a $197,000 HRSA grant (which was spent the same month on equipment).  Both amounts were received by the time of the confirmation hearing.  In October 2005, RMSA projected receiving an additional $154,000 in Medicaid reimbursement.  In November 2005, RMSA is due to receive its yearly $90,000 grant to pay the salary of Ms. Presnell.  The $1,625,000 grant anticipated to be received in December is a State appropriations request to build new facilities.

[5] RMSA's Statement of Activities lists the functional expenses by month.  Expenditures from January to August 2005 are those actually incurred, and those from September to December 2005 are projections.

|           | Expenditures | IRS Repayment | Total     | Net         |
|-----------|--------------|---------------|-----------|-------------|
| January   | $121,000     |               |           | ($ 18,000)  |
| February  | $110,000     |               |           | ($ 31,000)  |
| March     | $91,000      |               |           | $ 9,000     |
| April     | $96,000      |               |           | ($ 12,000)  |
| May       | $114,000     |               |           | ($ 13,000)  |
| June      | $101,000     |               |           | $ 1,000     |
| July      | $116,000     |               |           | ($ 6,000)   |
| August    | $115,000     |               |           | ($ 12,000)  |
| September | $332,000     |               |           | $ 42,000    |
| October   | $140,000     | $13,500       | $153,500  | $201,000    |
| November  | $140,000     | $13,500       | $153,500  | $ 84,000    |
| December  | $140,000     | $13,500       | $153,500  | $1,614,000  |

-10-

2005, however, RMSA anticipated having a net increase in assets of $42,000.  Included in the overall revenue for September 2005, was $56,000 in non-reoccurring Medicaid cost-based reimbursement, and no amount was allocated to RMSA's payments on its payroll tax liability of $13,500 per month.  Subtracting non-reoccurring income and deducting another $13,500 for installment payments due the IRS results in a net loss for September 2005 of $27,500 – assuming that RMSA could in fact generate $121,000 in patient revenue.

Third, in October 2005, RMSA projected that it would receive $154,000 in additional Medicaid cost-based reimbursement pursuant to a supplemental application. Ms. Smith testified that RMSA made a supplemental application after learning that it could be reimbursed for additional items not included on its original application.  However, no credible evidence was presented that Medicaid actually approved the supplemental reimbursement and there was no assurance that such a reimbursement would in fact be made. Indeed, in the Debtors' disclosure statement, submitted on October 25, 2004, they indicated that RMSA had received $56,000 in Medicare reimbursements in September 2004 and RMSA projected receiving the same amount in September 2005, which in fact came to pass. In addition, however, RMSA also forecasted receiving another $111,000 in Medicare reimbursement in January 2005, and an additional $200,000 Medicaid reimbursement in May 2005. Neither the $111,000 nor the $200,000 in reimbursement requests were ever

received by RMSA; consequently, the Court is skeptical that RMSA will receive the $154,000 in Medicaid reimbursement it projected for October 2005.

Fourth, in December 2005, RMSA projected receiving $1,625,000 from a North Carolina appropriation grant applied for by RMSA. Ms. Smith testified that RMSA's request was approved by the appropriate official but that no appropriation has been made. In short, the Debtors failed to show that there is a reasonable likelihood that RMSA will receive $1,625,000 pursuant to its appropriations request. Without receipt of the grant in December 2005 – assuming that RMSA could generate $142,000 in patient revenue for which there is an insufficient historical basis – its net loss for the month would be $11,500 after payment on its payroll tax liability. Moreover, it is doubtful that RMSA could use the appropriated money to pay operating expenses if that money was earmarked for the construction of new facilities.

Fifth, the Debtors have been operating in Chapter 11 for quite some time. Dr. Smith filed a chapter 7 case on March 20, 2003, and converted it to one under chapter 11 on April 12, 2004. Ms. Smith filed her chapter 11 case on March 1, 2004. Accordingly, the Debtors operated RMSA for eight months in 2004 and for eight months in 2005 under the umbrella of chapter 11 before submitting their final plan for confirmation. Until April 2005, RMSA was paying less than the monthly $14,333 required under the plan to be

-12-

transferred to FNB, and as of the confirmation hearing, RMSA has not paid anything on its payroll tax liability.  Yet, despite the lower amount of monthly disbursements, RMSA still lost $82,000 in the first eight months of 2005.  While the Court would expect to see such numbers prior to a reorganization case being filed, the Debtors have been afforded ample opportunity to turn these numbers around prior to the confirmation hearing but have failed.

Sixth, the Debtors' projections for 2006 depend on RMSA experiencing a substantial increase in patient revenue as well as receiving increased cost-based reimbursements from Medicaid and Medicare.  The projected yearly patient revenue has been increased from $1,394,000 in 2005, to $2,097,000 in 2006, an increase of $703,000 or 50.4%.  The justification for this increase is that RMSA expects to receive two "Ready Responder" physicians from the National Health Service Corps at no additional cost to RMSA.  Also, Debtors assert that RMSA will have received and installed new computer equipment prior to January of 2006, which will increase efficiency.  The Debtors, however, produced no documentary evidence to support the expectation that the Ready Responder physicians, in fact, will be assigned to RMSA for 2005.  The testimony regarding the Ready Responder program was very general and did not establish that NHSC had made a commitment to supply the physicians to RMSA. The evidence regarding the new computer equipment was likewise general and failed to supply enough specifics to quantify any

increase in income that might result from the use of new operating systems and new medical equipment. In fact, the equipment has not been installed, RMSA's employees have not been trained on the new equipment and software, and the exact nature of the benefits to be achieved is only conjecture.

Seventh, Ms. Smith testified that RMSA had applied for and received approval of a HRSA Migratory Grant for 2006 for $350,000. No explanation was offered, however, on whether this grant would provide any additional revenue to RMSA as its resources were diverted to serving the needs of the migratory community and not its pre-existing patient base. Dr. Smith testified that RMSA currently had all the business it could handle and that a five to seven week waiting period already existed to schedule an appointment with an RMSA physician. No basis exists in the record to believe that the HRSA Migratory Grant, if received, will produce any additional income for RMSA.

Eighth, it appears doubtful from the evidence that RMSA has adequate management in place. RMSA's failure to make its payroll tax obligations, and its failure to make a smooth transition between being a for-profit corporation to being a non-profit corporation are just two examples of the failure of its management. While RMSA has since hired a CFO and consultants, its management is largely unchanged. Notably, neither RMSA's CFO nor its accountants or financial consultant testified at the confirmation hearing.

Ninth, RMSA's Theoretical Revenue Model presented at the confirmation hearing regarding future income of RMSA is simply not credible. With RMSA's current staff of three physicians and a physician's assistant, RMSA projected that it could see 125 patients per day on Monday and Tuesday, 106 patient on Wednesday, and 88 patients on Thursday and Friday, for a total of 532 patients per week.[6] With an average billing per patient encounter of $91.50, that equates to weekly gross revenue of $48,678, monthly gross revenue of $194,712 over four weeks, and over 48 weeks, annual revenue of $2,336,544 – not accounting for any surgeries that Dr. Smith performs.[7] This amount is far in excess of any patient revenue actually earned by the same staff in the first eight months of 2005.

In sum, the Debtors have not proposed a feasible plan of reorganization because they have failed to show that RMSA will be able to continue operations and have enough money to pay rent expense of $14,333 per month, which is paid directly to FNB to cover the Debtor's mortgage payments, and to pay $13,500 per month to the IRS to repay its payroll tax debt, which if not paid is likely to be personally assessed against the Debtors. While the

---

[6] Dr. Smith testified that he only saw patients one-half day on Wednesday and that he performed surgery on Thursdays and Fridays.

[7] Even assuming that 20% of RMSA patients did not pay their bills, i.e., all non Medicare or Medicaid patients, RMSA's monthly revenue would be $155,769.

-15-

success of a plan does not have to be guaranteed, the evidence in this case is inadequate to support a finding of feasibility.

### B. Stay Relief

FNB argues that it should be allowed to foreclose on RMSA's property because the Debtors have failed to propose a feasible plan of reorganization. In fact, the Court had already granted FNB relief from the automatic stay in Dr. Smith's chapter 7 bankruptcy case on October 8, 2003. Dr. Smith then converted his case to chapter 11, obtained new appraisals, and moved to reconsider the court's lifting of the automatic stay. On March 8, 2004, FNB sought relief from the automatic stay in Ms. Smith's chapter 11 case. The Court agrees with FNB that it should have relief from the automatic stay in both cases.

Pursuant to section 362(d)(1) of the Bankruptcy Code, a court may grant relief from the automatic stay for "cause." 11 U.S.C. § 362(d)(1). "Because the Bankruptcy Code provides no definition of what constitutes 'cause,' the courts must determine when discretionary relief is appropriate on a case-by-case basis." Claughton v. Mixson, 33 F.3d 4, 5 (4th Cir. 1994). In determining if the automatic stay should be lifted for cause, the court generally "must balance potential prejudice to the bankruptcy debtor's estate against the hardships that will be incurred by the person seeking relief from the automatic stay if relief is denied." Robbins v. Robbins (In re Robbins), 964 F.2d 342, 345 (4th Cir.

-16-

1992) (discussing whether "cause" exists to pursue litigation outside of the bankruptcy court).

"Cause" can exist to lift the automatic stay when a debtor fails to propose a feasible chapter 11 plan of reorganization. E.g., In re Brown, No. 97-5302, 1998 U.S. Dist. LEXIS 16436 at *14-15 (E.D. Pa. Oct. 19, 1998) ("Appellant could not propose a feasible reorganization plan to the satisfaction of the Bankruptcy Court.  Thus, this Court cannot conclude that the Bankruptcy Court abused its discretion in concluding that cause existed to grant a relief from the stay . . . ."); Centofante v. CBJ Dev. (In re CBJ Dev.), 202 B.R. 467, 473 (B.A.P. 9th Cir. 1996) ("That a Debtor is unable to propose a feasible plan, may be grounds for relief from the automatic stay for "cause" under § 362(d)(1)."); In re Gulph Woods Corp., 84 B.R. 961, 974-75 (Bankr. E.D. Pa. 1988) ("The poor prospects for a successful reorganization and performances under the Plan result in our conclusion that cause for relief from the stay exists, pursuant to § 362(d)(1).").

"Cause" exists in these cases to lift the automatic stay because of the Debtors' inability to propose a feasible plan of reorganization despite being given ample opportunity.  In short, the Court is not convinced that RMSA will be able to both maintain its repayment obligation for unpaid payroll taxes of $13,500 per month, and pay its rent obligation of $14,333 per month with all of its other operating expenses.  Because the proposed plan is overly

optimistic about RMSA's future revenue, and consequently, its ability to pay the Debtors, the Court finds it highly unlikely that the Debtors and/or RMSA will be able to make the Debtors' required payments under the plan.  The Court also has serious doubts about whether the Debtors or RMSA could obtain refinancing to make the required balloon payment to FNB after three years when RMSA has historically lost money, and when it appears that RMSA will likely continue to lose money.

### III. CONCLUSION

The Court will deny confirmation of the Debtors' joint chapter 11 plan because the proposed plan is not feasible.  The Court will grant FNB relief from the automatic stay, effective 30 days from entry of the accompanying Order due to the Debtors' inability to propose a feasible plan.

A separate order will be entered contemporaneously herewith pursuant to Fed. R. Bankr. P. 9021.

Parties to be Served

Rayford K. Adams, III, Esq.
P.O. Box 20570
Greensboro, NC 27420

June L. Basden, Esq.
P.O. Box 540
Greensboro, NC 27402

Dr. and Mrs. Leroy Smith
1026 Country Home Road
Reidsville, NC 27320

Michael D. West
Bankruptcy Administrator