UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

IN RE:                          )
                                )
Leroy Carter Smith,             )      Case No. 03-10992C-11G
                                )
        Debtor.                 )
_____  )
                                )
Louise M. Smith,                )      Case No. 04-10633C-11G
                                )
        Debtor.                 )
                                )

## MEMORANDUM OPINION

These cases are in the bankruptcy court pursuant to an order of remand that was entered in the district court on July 21, 2006, following an appeal to the district court by the Debtors. The Debtors appealed from an order entered by this court on November 9, 2005, that denied confirmation of the Debtors' third amended plan of reorganization. These cases came before the court on November 27, 2006, for a confirmation hearing. Appearing for the confirmation hearing were the Debtors, Larry S. Height, attorney for the Debtors, June L. Basden, attorney for FNB Southeast, Michael D. West, appearing as United States Bankruptcy Administrator, and Rebecca A. Leigh, attorney for Citicorp Vendor Finances, Inc. Having considered the amended plan proposed by the Debtors, the objections to amended plan, the evidence offered at the hearing and the matters of record in these cases, the court makes the following findings of fact and conclusions of law pursuant to Rules 9014 and 7052 of the Federal Rules of Bankruptcy

Procedure.

## I.   JURISDICTION

This court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157 and 1334, and the General Order of Reference entered by the United States District Court for the Middle District of North Carolina on August 15, 1984.

## II. BACKGROUND

The male Debtor is a physician working for RMSA, Inc. ("RMSA"), a non-profit corporation that provides medical services in Rockingham County, North Carolina.   The female Debtor is the chief executive officer of RMSA, and the Debtors jointly own the office building and land where RMSA conducts its business.   The female Debtor does not have a background in business administration or accounting; rather, she has a bachelor's degree in child development, and is educated in Bible theology and church ministry.

FNB Southeast ("FNB") is the largest creditor of the Debtors. FNB holds one promissory note from the Debtors and two other individuals with an unpaid balance of approximately $38,000.00 that is secured by real property referred to as the church property. FNB holds two other promissory notes from the Debtors in the original amounts of $1,377,000.00 and $65,655.36, respectively. These notes are secured by a deed of trust on Debtors' office building and land, which the Debtors value at $1,890,000 and, according to FNB, have a balance of $1,490,000.   FNB also is

- 2 -

secured by the Debtors' personal residence, valued at $270,000, and a 31.7 acre tract of land, valued at $120,000.

The ability of the Debtors to fund a plan of reorganization is heavily dependent on the success of RMSA for three reasons. First, RMSA pays the Debtors' salaries. Second, RMSA pays the Debtors' rent for the land and office building, which the Debtors use to pay the note to FNB. If RMSA were unable to pay the rent for the office building and FNB were to proceed with foreclosure, RMSA and the Debtors would be faced with finding another location for their clinic. Third, the IRS claims that RMSA owes $856,025.17[1] in unpaid payroll taxes, interest, and penalties, for which the Debtors may be personally liable under 26 U.S.C. § 6672 should RMSA fail to fully pay that debt. Although the Debtors now dispute the payroll taxes, they are faced with personal liability to the extent such taxes are due and are not paid by RMSA.

These cases date back to March 20, 2003, when Dr. Smith filed for relief under Chapter 7. His filing was prompted by a threatened foreclosure by FNB with respect to the deeds of trust that encumber Debtors' office building and residence. After FNB filed a motion for relief from the automatic stay in order to foreclose its deeds of trust, Dr. Smith purported to convert his case from Chapter 7 to Chapter 13 on August 26, 2003. However,

---

[1] This figure is the amount of a tax lien that was filed against RMSA by the IRS on September 20, 2005.

because his indebtedness exceeded the limit for a Chapter 13 debtor, Dr. Smith was not eligible to be a debtor under Chapter 13, and the conversion to Chapter 13 was vacated on September 26, 2003.

Following a hearing in Dr. Smith's case on September 30, 2003, an order was entered on October 8, 2003, granting FNB's motion for relief from the automatic stay.  When out-of-court negotiations between the Smiths and FNB during the latter part of 2003 were not fruitful, FNB pressed forward with a state court foreclosure proceeding against the Smiths.  Following a foreclosure hearing in state court, a foreclosure sale was authorized by the state court. The foreclosure sale was scheduled for March 2, 2004.  On March 1, 2004, the day before the scheduled sale, Mrs. Smith filed a petition for relief under Chapter 11.  This filing again brought the automatic stay into effect, thereby preventing the foreclosure sale that was scheduled for March 2, 2004.

On April 14, 2004, Dr. Smith's Chapter 7 case was converted to one under Chapter 11, and on May 6, 2004, an order was entered granting the request of the Smiths that their cases be jointly administered.  This order provided only for joint administration and did not substantively consolidate the cases.

Pursuant to orders that were entered in each of the cases, August 18, 2004, was established as the initial deadline for the filing of a plan of reorganization and disclosure statement by the Smiths ("the Debtors").  At the request of the Debtors, this

deadline was extended to October 16, 2004. A second extension was obtained by the Debtors extending the deadline for the plan and disclosure statement to October 25, 2004. On October 25, 2004, the Debtors filed their initial plan and disclosure statement.

A hearing on the adequacy of Debtors' initial disclosure statement was held on December 28, 2004. There were objections to the disclosure statement and the disclosure statement was not approved. Thereafter, on February 8, 2005, the Debtors filed their first amended plan and first amended disclosure statement in an effort to address the objections previously raised. On February 15, 2005, an order was entered approving the first amended disclosure statement and scheduling a confirmation hearing on Debtors' first amended plan for April 5, 2005.

As a result of objections raised at the April 5 hearing, the Debtors were not able to obtain confirmation on April 5, and the confirmation hearing was continued to May 3, 2005, at Debtors' request. On May 3, 2005, at the request of the Debtors, the confirmation was continued to May 17, 2005. On May 17, 2005, the Debtors obtained a continuance of the confirmation hearing to June 7, 2005. On June 7, the Debtors requested another continuance and the confirmation hearing was continued to July 7, 2005. These postponements were granted to the Debtors in order to give them additional time to resolve the objections that prevented the confirmation of the first amended plan at the April 5 confirmation

hearing.

On June 20, 2005, the Debtors filed their second amended plan of reorganization. As a result of the filing of Debtors' second amended plan, the confirmation hearing scheduled for July 7, 2005, was continued to August 2, 2005. In the meantime, on July 15, the Debtors filed their third amended plan of reorganization. On August 12, 2005, the Debtors again amended, this time in the format of an amendment to the third amended plan of reorganization that altered the treatment proposed for FNB.

After the balloting on the third amended plan was completed, the court conducted a confirmation hearing for consideration of the third amended plan of reorganization on August 12, 2005. There were objections to Debtors' third amended plan and confirmation was contested at the hearing. For the reasons set forth in detail in a memorandum opinion that was filed on November 9, 2005, the court denied confirmation of Debtors' third amended plan of reorganization. The court also granted FNB's motion for relief from the automatic stay in Mrs. Smith case and denied reconsideration of the earlier order in Dr. Smith's case that lifted the stay in his case.

The Debtors appealed to the district court and an order was entered by this court granting the Debtors a stay pending the appeal to the district court. The record on appeal was docketed in the district court. However, after the record on appeal was

docketed and the appellate brief prepared and filed, the counsel who was representing the Debtors at that time moved to withdraw from further representation of the Debtors and the withdrawal was allowed in both the bankruptcy court and the district court. The withdrawal occurred prior to the oral arguments in the district court and the Debtors appeared pro se for the oral arguments.

At the hearing in the district court the Debtors apparently "conceded that the Bankruptcy Court's determination was not erroneous based on the information before it." Order of remand, p. 5. However, the Debtors asserted that "the information before the Bankruptcy Court was incomplete and inaccurate due to the conflict between the Smiths and their former counsel." Order of remand, p. 5. The district court concluded that the case should be remanded to the bankruptcy court "for consideration of any new evidence, as well as any prior evidence that was available to the Smiths but was not previously presented by the Smiths' former counsel." Order of remand, p. 6. The district court's July 21, 2006 order then dismissed the appeal without prejudice and remanded the cases to the bankruptcy court and also ordered that the stay previously ordered by the bankruptcy court would remain in effect pending the subsequent determination by the bankruptcy court and any appeal to the district court of such determination.

Following a scheduling hearing in the bankruptcy court on August 22, 2006, an order was entered on August 22, 2006,

scheduling a confirmation hearing for October 4, 2006. Following the scheduling hearing, the Debtors obtained new counsel. At the October 4, 2006 confirmation hearing new counsel for the Debtors requested a postponement and the confirmation hearing was continued to October 18, 2006.

On October 17, 2006, the day before the scheduled confirmation hearing, the Debtors filed an amended plan of reorganization and amended disclosure statement. The new plan changed the treatment of FNB's Office/Residence claim in several respects. The length of the payout period on FNB's secured obligations was increased from three years to ten years, the interest rate was reduced from prime plus 2% to a flat 7%, the monthly payments to FNB were reduced from $15,000.00 per month to $10,000.00 per month and the total payout to FNB for principal and interest was capped at $1,200,00.00 (120 payments at $10,000.00 each) rather than having a balloon payment for the balance of the allowed amount of the claim. The amended plan also changed the treatment of the unsecured creditors, including the treatment of Citicorp Vendor Finances, Inc. ("Citicorp"), the only creditor that had voted in favor of the third amended plan. Two additional classes of unsecured creditors were created under the new plan, Citicorp was placed in one of the new classes and no payment was proposed for Citicorp apparently because it was secured by liens on equipment owned by the predecessor to RMSA.

As a result of the filing of the new amended plan on October 17, the confirmation hearing scheduled for October 18, 2006, was postponed to November 27, 2006. The order postponing the hearing also set deadlines for objections to and voting on the new plan. Thereafter, timely objections to the new plan were filed by FNB, the Bankruptcy Administrator and Citicorp who also filed a ballot rejecting the new plan.

On November 21, 2006, the Debtors filed another plan of reorganization. Although designated as an additional plan, the November filing essentially amounted to an amendment to the treatment for only two classes of creditors consisting of an amendment to the treatment for FNB's Office/Residence claim and an amendment to the treatment for the claims of unsecured creditors. Additional provisions pertaining to payroll taxes also were included in the November 21 filing. The amendment to the treatment proposed for the FNB Office/Residence claim estimated the total FNB indebtedness on the Office/residence notes at $792,837.00 and proposed 90 monthly payments of $15,000.00 each to FNB, apparently without any balloon payment at the end of the 90 monthly payments, for a total payout of $1,350,000 including principal and interest at 7% per annum. The treatment for unsecured creditors was changed by creating a single class for all unsecured creditors and proposing a 10% dividend payable in four quarterly payments. The November plan also contained a class for contingent payroll tax

- 9 -

liability in which the Debtors, contrary to their earlier plans, asserted that neither RMSA nor the Debtors owed any payroll taxes.

DISCUSSION

Section 1127(a) of the Bankruptcy Code provides as follows:

> The proponent of a plan may modify such plan at any time before confirmation, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title.  After the proponent of a plan files a modification of such plan with the court, the plan as modified becomes the plan.

Pursuant to section 1127(a), the Debtors, as the proponents of the third modified plan that previously was before the court, had the right to modify the third amended plan by filing a modification with the court.  The Debtors  exercised such right when they filed modified plans on October 17, 2006, and on November 21, 2006.  The modified plan filed on November 21 was designated by the Debtors as Debtors' Fourth Amended Plan of Reorganization (hereinafter referred to as the "Fourth Amended Plan") and was the last modification by the Debtors.  Accordingly, pursuant to section 1127(a), the Fourth Amended Plan became the plan for consideration in these cases and is the plan for which the Debtors sought confirmation at the November 27, 2006 confirmation hearing.

1.  Burden of Proof.

At a confirmation hearing, the proponent of a plan "bears the burdens of both introduction of evidence and persuasion that each subsection of section 1129(a) has been satisfied."  7 COLLIER ON

BANKRUPTCY ¶1129.02[4] (15th ed. rev. 2006). "If nonconsensual confirmation is sought, the proponent of such a plan will have to satisfy the court that the requirements of section 1129(b) are also met." Id. In the present case, the Debtors sought "nonconsensual confirmation" of the Fourth Amended Plan since the Fourth Amended Plan was objected to by FNB, Citicorp and the BA and was not accepted by any class that was impaired. Thus, in order to obtain confirmation, the Debtors were required to establish by a preponderance of the evidence that the requirements of both section 1129(a) and 1129(b) were satisfied by the Fourth Amended Plan. The Debtors failed on both accounts.

     2.  The Objections to the Plan.

As a result of the modifications that the Debtors injected with their October 16 amended plan and the Fourth Amended Plan in November, the objections and voting with respect to the Fourth Amended Plan were different than the objections and voting that were before the court at the first confirmation hearing on August 12, 2005 when the third amended plan was before the court. Whereas the objections to the third amended plan in September of 2005 were based upon an asserted failure to satisfy the feasibility requirement of section 1129(a)(11), the subsequent modifications proposed by the Debtors engendered objections under additional subsections of section 1129(a), including sections 1129(a)(7), 1129(a)(8), 1129(a)(10), as well as a continuing feasibility

objection under section 1129(a)(11).

          3.    Best Interests of Creditors
               Requirement Under Section 1129(a)(7).

Section 1129(a)(7) imposes as a requirement for confirmation that each holder of a claim or interest in an impaired class either accept the plan or "receive or retain under the plan . . . property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title . . . ." This provision commonly is referred to as the best interests of creditors test. As pointed out in COLLIER, section 1129(a)(7) provides an individual guaranty to each creditor or interest holder that it will receive at least as much in reorganization as it would in liquidation. 7 COLLIER ON BANKRUPTCY ¶ 1129.03[7] (15th ed. rev. 2006). Under section 1129(a)(7), absent consent, each creditor or interest holder in an impaired class must receive (i) property (ii) that has a present value equal to (iii) that participant's hypothetical chapter 7 distribution (iv) if the debtor were liquidated instead of reorganized on the effective date of the plan. Id.

Under the Fourth Amended Plan, there are ten classes of creditors: Class 1 - Administrative Expense Claims, Class 2 - Rockingham County Tax Collector Claims, Class 3 - City of Reidsville Claims, Class 4 - Contingent Payroll Tax Claims, Class 5 - Tax Claims for Income Taxes, Class 6 - Secured Claim of

BB&T, Class 7 - Secured Claim of FNB Southeast (Church), Class 8 - Secured Claims of FNB Southeast (Office/Residence), Class 9 - Secured Claim of Volvo, and Class 10 - Claims of General Unsecured Creditors.   With the exception of Class 1 for administrative expense claims and Class 9 for the Volvo claim (which was paid prior to the confirmation hearing), all other classes in the Fourth Amended Plan are impaired.   Since none of these classes accepted the plan, section 1129(a)(7) is applicable to each of the creditors with claims in such classes.

In order to show that a payment under a plan is equal to the value that the creditor would receive if the debtor were liquidated, there must be a liquidation analysis of some type that is based on evidence and not mere assumptions or assertions.   <u>See</u> <u>In re Mcorp Fin., Inc.</u>, 137 B.R. 219, 228-29 (Bankr. S.D. Tex. 1992); <u>In re Modern Steel Treating Co.</u>, 130 B.R. 60, 64 (Bankr. N.D. Ill. 1991); 7 COLLIER ON BANKRUPTCY ¶ 1129.03[7][b][iii] (15th ed. rev. 2006)("This statutory language essentially requires every plan proponent to perform a liquidation analysis of the estate.").

The Debtors offered no evidence from which the court could conclude that the requirements of section 1129(a)(7) are satisfied by the Fourth Amended Plan.   No liquidation analysis of any kind was attempted by the Debtors and there was no showing, for example, that the 10% dividend proposed for unsecured creditors matches what the unsecured creditors would receive if the Debtors' considerable

assets were liquidated under Chapter 7.  According to the Debtors, their real estate (which they valued at $1,890,000.00) has a value considerably greater than the secured debt owed to FNB (which the Debtors estimated at $793,000.00 and which FNB estimated at $1,490,000.00).  The Debtors also own three automobiles that are debt free.  Moreover, according to Debtors, rather than owing payroll taxes or income taxes, they are due refunds totaling $22,237.00 which they propose to retain.  Nothing else appearing to the contrary, these figures tend to show that the unsecured creditors likely would receive a distribution larger than 10% if the Debtors' assets were liquidated, and certainly would not support a finding that the Fourth Amended Plan complies with section 1129(a)(7).  Accordingly, the court concludes that the Debtors have failed to show that the Fourth Amended Plan is in the best interests of creditors within the meaning of section 1129(a)(7).

4.  Section 1129(a)(8).

Section 1129(a)(8) can be satisfied only if each class under a proposed plan either has accepted the plan or is not impaired under the plan.  The Fourth Amended Plan obviously does not satisfy Section 1129(a)(8) since there are eight impaired classes and none of the eight impaired classes have accepted the Fourth Amended Plan.

- 14 -

Section 1129(a)(8) is the one subsection of section 1129(a) that does not have to be satisfied in order for a plan to be confirmed. This is true because under section 1129(b), a plan that does not satisfy section 1129(a)(8) nonetheless can be confirmed if the plan satisfies the cram down requirements contained in section 1129(b). However, if cram down is not available, a failure to satisfy section 1129(a)(8) is a bar to confirmation. That is the situation in the present case because the Fourth Amended Plan does not satisfy the requirements of section 1129(b) and cram down is not available.

Section 1129(b)(2)(B), precludes confirmation of a plan over the objection of an impaired class of creditors unless "the holder of any claim or interest that is junior to the claims of such [impaired] class will not receive or retain under the plan on account of such junior claim or interest any property." 11 U.S.C. § 1129(b)(2)(B)(ii). "In other words, creditors may insist on priority of payment: secured creditors must be paid in full before unsecured creditors retain any interest, and unsecured creditors must be paid off before equity holders retain an interest." Wilkow v. Forbes, Inc., 241 F.3d 552, 554 (7th Cir. 2001). This principle is commonly referred to as the absolute priority rule. The essence of the rule is that a junior class of creditors or interest holders may not receive or retain any property on account of their claims or interest unless the claims or interest of a dissenting senior

class are satisfied in full.

The absolute priority rule is applicable in chapter 11 cases involving individual debtors.  <u>Norwest Bank v. Ahlers</u>, 485 U.S. 197, 202, 108 S.Ct. 963, 966, 99 L.Ed.2d 169 (1988)("Under current law, <u>no</u> Chapter 11 reorganization plan can be confirmed over the creditors' legitimate objections . . . if it fails to comply with the absolute priority rule.").  In the present case, the Debtors propose to pay the unsecured creditors only a 10% dividend, while retaining all of their assets under a plan that has been rejected by the unsecured creditors.  Under such circumstances, the absolute priority rule precludes confirmation.  <u>See</u> <u>In re Gosman</u>, 282 B.R. 45 (Bankr. S.D. Fla. 2002); <u>In re Davis</u>, 262 B.R. 791 (Bankr. D. Ariz. 2001); <u>In re Ashton</u>, 107 B.R. 670 (Bankr. D.N.D. 1989); <u>In re Yasparro</u>, 100 B.R. 91 (Bankr. M.D. Fla. 1989); <u>In re Stegall</u>, 85 B.R. 510 (Bankr. C.D. Ill. 1987).

     5.  Section 1129(a)(10).

Section 1129(a)(10) imposes the following requirement in order for a plan to be confirmed:

> If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

The requirement imposed by section 1129(a)(10) is simple and straight forward.  A plan that has one or more impaired classes cannot be confirmed unless at least one of the impaired classes

accepts the plan.  The only creditor that voted to accept the third amended plan back in August of 2005 was Citicorp.  The modified plan that was filed on October 17, 2006 provided different, less favorable treatment for Citicorp and the other unsecured creditors. Citicorp then voted to reject the October 17 amended plan, and declined to change its vote in order to accept the Fourth Amended Plan.  In fact, no creditors voted to accept the Fourth Amended Plan.  The failure of a creditor to cast a ballot does not result in the acceptance of the plan by that creditor.  In re Jim Beck, 207 B.R. 1010, 1015 (Bankr. W.D. Va. 1997), aff'd, 214 B.R. 305 (W.D. Va. 1997), aff'd, 162 F.3d 1155 (4th Cir. 1998).  The result is that no impaired class of claims accepted the Fourth Amended Plan, which standing alone, precludes confirmation of the Fourth Amended Plan.   In re Willows Convalescent Centers Limited Partnership, 151 B.R. 220 (D. Minn. 1991); In re Polytherm Industries, Inc., 33 B.R. 823 (W.D. Wis. 1983); In re Dunes Hotel Associates, 188 B.R. 174 (Bankr. D.S.C. 1995); In re Russell, 44 B.R. 452 (Bankr. E.D.N.C. 1984).

6.  Section 1129(a)(11) - Feasibility.

Section 1129(a)(11) of the Bankruptcy Code requires as a precondition to confirmation that a court determine that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan . . . ."

11 U.S.C. § 1129(a)(11).   The purpose of this feasibility requirement "'is to prevent confirmation of visionary schemes which promises creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation.'"   In re Pizza of Haw., Inc., 761 F.2d 1374, 1382 (9th Cir. 1985) (citation omitted).   Thus, a bankruptcy court has an obligation to carefully review a plan to determine if it is workable.   In re Monnier Bros., 755 F.2d 1336, 1341 (8th Cir. 1985).   Success need not be guaranteed – the possibility that a plan may fail is not fatal – but a plan must be supported by adequate evidence that some reasonable assurance of success exists.   Kane v. Johns-Manville Corp., 843 F.2d 636, 649 (2d Cir. 1988); In re Prussia Assocs., 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005).   The debtor has the burden of demonstrating that a plan is feasible.   E.g., Lisanti v. Lubetkin (In re Lisanti Foods, Inc.), 329 B.R. 491, 496 (D.N.J. 2005) ("[T]he burden is on the plan proponents to prove that all the applicable provisions of 11 U.S.C. § 1129 have been satisfied."); In re Deep River Warehouse, Inc., No. 04-52749, 2005 Bankr. LEXIS 1793 at *5 (Bankr. M.D.N.C. Sept. 22, 2005) (same).

After considering the evidence offered at the previous confirmation hearing on August 12, 2005, this court concluded that the Debtors's third amended plan was not a feasible plan because the Debtors failed to show that RMSA would be able to continue

operations and have enough money to pay rent expense of $14,333 per month (to service the FNB indebtedness) and to pay $13,500 per month to the IRS as proposed by the Debtors to repay payroll taxes owed by RMSA, which if not paid by RMSA likely would be assessed against the Debtors personally. As explained in detail in the memorandum opinion (pages 9-15), one of the reasons for reaching this conclusion was that the RMSA income projected by the Debtors for the rest of 2005, 2006 and 2007 was unduly optimistic and unrealistic, as were the other projected future sources of funds such as future Medicaid cost-based reimbursements, grants that had been applied for but not approved or granted, and "Ready Responder" physicians who allegedly would be provided to RMSA at no cost to RMSA. These projections were not borne out by the evidence offered at the hearing on November 21. For example, at the first confirmation hearing, in their Exhibit No. 6, the Debtors projected that RMSA's 2006 patient revenue would be $2,097,000 and that total funds received in 2006 would be $3,431,000. At the November 21 hearing, RMSA's bank records reflected that the total receipts for RMSA though August of 2006 were only $624,166 which, through extrapolation, would indicate that the total revenue for 2006 will be $936,249. This indicates that RMSA's total income for 2006 likely will be less than one half of the patient revenue earlier projected by the Debtors and one third of the total revenue projected by the Debtors for 2006. Apparently, one reason for this

large discrepancy is that the number of professionals at RMSA has shrunk since the first confirmation hearing.  This is critical because it is the professionals who generate revenue.  Whereas RMSA had three physicians and one physician's assistant ("P.A.") in 2005, RMSA now has only two physicians and no P.A.'s currently employed.  Yet, the projections produced by the Debtors at the November 21 hearing (Debtors' Exhibit E) included four physicians and two P.A.'s.  The large revenue figures contained in these latest projections thus included projected income for two physicians and two P.A.'s who are yet to be hired.  Although Debtors' projections were dependent on these new hires, there was no credible evidence regarding the likelihood of RMSA being able to employ the additional professionals, the cost of doing so or why, after three years in Chapter 11, the new physicians and P.A.'s still have not been hired.  Just as with the earlier projections, Debtors' latest income projections are far in excess of any patient revenue actually produced at RMSA and appear highly speculative. Although the two witnesses called by the Debtors were qualified in their fields, it was apparent that these witnesses had very limited information regarding the actual operations of RMSA.  For example, the accountant called by the Debtors had spent only a total of eight hours with the Debtors and had not confirmed the actual revenue being produced at RMSA or its expenses, did not know how many patients were being seen at RMSA and did not know whether any

actual steps had been taken to hire additional physicians and P.A.'s.

The Debtors took a different approach at the November 21 hearing regarding the liability of RMSA for delinquent payroll taxes and their potential personal liability for any such taxes. Although previous disclosure statements and plans conceded that RMSA owed withholding and other payroll taxes for 2002, 2003 and 2004 that exceeded $800,000, Debtors asserted in the Fourth Amended Plan and at the November 21 hearing that RMSA no longer owed any payroll taxes. The evidence did not support this assertion. The only evidence offered in support of this new position was Mrs. Smith's testimony and the testimony of Mr. Bogues who testified that when he talked with IRS employees in Durham on November 22, 2006, he was told that RMSA did not owe any payroll taxes. No written documentation from the IRS was produced showing that RMSA had paid its payroll taxes nor were the Debtors able to offer any proof of payment or evidence regarding how and when the payroll taxes were paid. More convincing was the federal tax lien documenting delinquent payroll taxes of $856,025.17 that was recorded against RMSA on September 20, 2005, and remained unsatisfied on the date of the hearing, and the testimony of the IRS agent who testified that the trust fund portion of those taxes in the amount of $400,000 had been assessed against the Debtors as responsible officers of RMSA. Having weighed the conflicting

evidence offered at the hearing, the court finds that the payroll taxes listed in the tax lien (FNB Exhibit No. 1) have not been paid and therefore should be considered in determining whether RMSA will be able to pay the amounts required in order for the Debtors to fund the Fourth Amended Plan. Because the Debtors have failed to show that RMSA will be able to continue operations and have enough money to pay rent expense of $15,000 per month (the amount of the proposed payment to FNB) and to pay the delinquent payroll taxes, the court concludes that the Debtors have failed to show that the Fourth Amended Plan is a feasible plan within the meaning of section 1129(a)(11).

   7.   Dismissal Pursuant to Section 1112(b).

   Pursuant to an order and notice of hearing issued on October 19, 2006, a hearing was held at the conclusion of the confirmation hearing on November 27, 2006 for a determination as whether these cases should be dismissed or converted to Chapter 7 pursuant to section 1112(b). The court has concluded that there is ample cause for the dismissal of these cases and that it would be in the best interests of the creditors and the estate to dismiss these cases rather than converting them to cases under Chapter 7.

   Dr. Smith's case has been pending for more than three years, while Mrs. Smith case has been pending for more than two and one half years. During the long pendency of these cases the Debtors have been unable to propose a confirmable plan. As time has passed

and the Debtors' plans have evolved, it has become clear that their chances of proposing a confirmable plan have diminished rather than improved, as evidenced by the numerous deficiencies in their most recent plan.  At this point in these cases, there is not a reasonable likelihood of rehabilitation under Chapter 11 and no justification for allowing these cases to continue under Chapter 11.  Dismissal may result in the Debtors and RMSA having to relocate their offices, but does not mean that they cannot provide medical services at another location that is more affordable.  Moreover, this court cannot ignore the interest of the creditors in this case.  The result of the inability of the Debtors to propose a confirmable plan has been unreasonable and prejudicial delay to their creditors which should not be permitted to continue.

8.  Conclusion.

Based upon the foregoing findings and conclusions, an order shall be entered denying confirmation of the Fourth Amended Plan and dismissing these cases.  The other motions scheduled for hearing shall be denied as moot, based upon the dismissal of these cases.

This 11th day of December, 2006.

William L. Stocks
WILLIAM L. STOCKS
United States Bankruptcy Judge

- 23 -

PARTIES IN INTEREST

Leroy Carter Smith
1026 Country Home Road
Reidsville, NC 27320

Louise M. Smith
1026 Country Home Road
Reidsville, NC 27320

Larry S. Height, Esq.
P.O. Box 27931
Raleigh, NC 27611-7931

June L. Basden, Esq.
P.O. Box 540
Greensboro, NC 27402-0540

Rebecca A. Leigh, Esq.
301 S. Greene Street, Suite 201
Greensboro, NC 27401

Timothy L. Hanson, Esq.
5121 Parkway Plaza Drive, Suite 300
Charlotte, NC 28217

Michael D. West, Bankruptcy Administrator